# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                                                      **Case No. 25-MJ-808**

**ZIDAN W. ABDALLAH**
        **Defendant.**

## DECISION AND ORDER

The government seeks district court review of a magistrate judge's order releasing defendant Zidan Abdallah on conditions. See 18 U.S.C. § 3145(a). For the reasons that follow, I grant the government's motion and stay defendant's release pending a de novo hearing in this court.

## I. BACKGROUND

**A.    The Complaint**

On February 7, 2025, the government obtained an arrest warrant and criminal complaint charging defendant with violations of 18 U.S.C. § 245(b)(2) (federally protected activities), 18 U.S.C. § 875(c) (interstate threats), and 18 U.S.C. § 1038(a) (false information and hoaxes). According to the supporting affidavit, on December 23, 2024, security personnel at the University School of Milwaukee (USM) contacted the River Hills Police Department (RHPD) to report receipt of a bomb threat from telephone number 587-205-6694, which was determined to be a "spoof" or fake number. (R. 1 at 3 ¶ 6.) USM personnel further advised that a threatening voicemail had been left from number 947-686-2997 on December 21, 2024. RHPD found this number associated with defendant in Franklin Police Department and Mequon Police

Department reports. The number was also attributed to defendant in reports from the University of California, Santa Barbara Police Department (UCSB); on December 22, 2024, defendant's father contacted UCSB reporting that defendant had left him a voicemail from this number threatening to kill him.[1] (R. 1 at 3 ¶ 7.)

On December 24, 2024, USM contacted RHPD to advise that another threatening voicemail was found from 414-415-4374, a number not attributed to a caller or carrier. However, the voice sounded like defendant, a former student at USM who had been expelled due to behavioral issues. Defendant also previously threatened a female USM student. (R. 1 at 3-4 ¶ 8.)

On January 8, 2025, USM security guard J.P. told the affiant-FBI agent that during the call on December 23, 2024, the caller threatened to blow up the school and made statements related to religion. (R. 1 at 4 ¶ 9.) J.P. further stated that she believed the person who made the bomb threat and left the threatening voicemails may be the same person. J.P. provided the agent-affiant with the voicemails from the 2997 and 4374 numbers. (R. 1 at 4 ¶ 10.)

In the December 21, 2024 message from the 2997 number, the caller identifies himself by name (Zidan Abdullah) and proceeds to make a series of profane and threatening comments. (R. 1 at 4-5 ¶ 11.) The December 23 message from the 4374 number contains similarly profane and threatening comments. (R. 1 at 5 ¶ 12.)

On January 6, 2025, A.F. contacted the Milwaukee FBI to report videos posted to Instragram threatening Jewish students and an Indian student. The poster, who appears in many of the videos, was identified by USM students and parents as defendant. (R. 1 at 5 ¶ 13.)

---

[1]As indicated in the bond study, defendant was at the time attending college in Santa Barbara, California.

The affiant reviewed the videos provided by A.F. In one, defendant threatens to kill M.J. and calls her a "disgusting, evil Indian." (R. 1 at 5 ¶ 14.) In another, he states: "It's time for the Jews to die and the Indians to die." (R. 1 at 6 ¶ 14.)

On January 6, 2025, M.J. contacted UCSB to report receipt of direct messages from defendant via Instragram Messenger threatening to kill her. He also posted a video threatening to "slice your fucking head off your body" and calling M.J. an "Indian slut." (R. 1 at 6 ¶ 15.) M.J. advised that she had attended school with defendant at USM, but they were not friends and did not really know each other.[2] Defendant was served with an Emergency Protective Order (EPO) for M.J. When served with the order, defendant told the officer: "It doesn't matter either because if she's gonna be killed she's gonna be killed with me and my army." (R. 1 at 6 ¶ 15.) A later story on defendant's account contained a video of the EPO torn into pieces. (R. 1 at 6 ¶ 15.) UCSB arrested defendant for state law violations of criminal trespass and stalking. (R. 1 at 6 ¶ 16.)

The affidavit further stated that on December 18, 2024, defendant's father, who lives in Wisconsin, made a missing person report to UCSB after defendant had not contacted his father for several hours after sending threatening text messages to his father and other family members. The report listed the 2997 number as the contact number for defendant. (R. 1 at 6 ¶ 17.) A Santa Barbara Sheriff's Department report dated December 23, 2024, also associated the 2997 number with defendant, after defendant was arrested for vandalism and assault of a security guard at a marijuana dispensary in Isla Vista, California. (R. 1 at 7 ¶ 18.)

On January 6, 2025, former USM student H.L. made a complaint to the Mequon Police

---

[2]M.J. was at that time also attending college in Santa Barbara. (R. 2 at 1.)

3

Department regarding threats by defendant, including threats to kill H.L. Defendant also posted images showing his admiration for Luigi Mangione, a suspect in an allegedly planned assassination. (R. 1 at 7 ¶ 19.)

Finally, on January 16, 2025, USM provided a compilation of numerous videos in which defendant references killing Jews and specifically threatens several USM students who are Jewish. (R. 1 at 7 ¶ 20.)

**B.     Defendant's Arrest and Release in California**

Defendant was arrested by California state authorities on January 6, 2025, for threatening and stalking M.J. (R. 2 at 1.) On February 18, 2025, a California state court granted him release on conditions, including that he reside at the Meadowglade Residential Treatment Facility. (R. 4 at 2, R. 4-2.) The following day, defendant appeared in front of a federal magistrate judge in the Central District of California on this court's warrant. (R. 2 at 2, R. 6 at 2.)

Pre-trial services prepared a bond study, which recommended that defendant be detained as a danger and a flight risk. The report detailed a history of mental health concerns beginning when defendant was 12 years old. He was diagnosed with Attention Deficit Hyperactivity Disorder, Borderline Personality Disorder, and Severe Depression prior to turning 18. He had been involuntarily hospitalized and released five times from December 14, 2024, until January 11, 2025. Defendant further disclosed experimenting with marijuana daily since moving to California; he reported disliking being dependent on psychotropic medications and attempted to cope with his symptoms by using marijuana. Defendant's father confirmed the five involuntary holds since December. He further indicated that defendant had been accepted into the Meadowglade 90-day Residential Treatment Program. The pre-trial services officer

4

contacted Meadowglade, which confirmed the placement. Meadowglade is not a lock-down facility but rather an at-will program, so defendant could sign himself out at any time.

The bond study reported no prior convictions but three recent arrests: on December 23, 2023, in California for vandalism and battery; on January 6, 2025, in California for battery to a peace officer; and on February 19, 2025, in California for threat to bomb. Defendant was also listed as the restrained party on protection orders issued on January 17, 2025, and January 13, 2025. Finally, the report detailed several recent instances where defendant allegedly exhibited violent behavior. On August 28, 2024, defendant was admitted into Santa Barbara Cottage Hospital after making threats towards himself and his roommate; at that time, his roommate reported fearing for his life. On October 1, 2024, while visiting Milwaukee, defendant's family requested police intervention due to defendant throwing things in the home and making threats towards family members. On December 16, 2024, local police were called following defendant throwing chairs in multiple businesses. On December 19, 2024, defendant allegedly made threats to a local Mosque and was reported missing by family members. On December 23, 2024, defendant allegedly assaulted an employee of a local grocery store and a security guard at a marijuana dispensary. Following his arrest, he allegedly spit on a police officer. On December 30, 2024, defendant was reported to be yelling and allegedly making threats from his apartment; his roommate requested a police escort to retrieve his belongings from the apartment.

The bond study concluded that, while defendant had a confirmed bail resource (his father) and was willing to attend treatment, he had severe mental health concerns and substance use concerns. Therefore, pretrial services believed there were no conditions that could mitigate concerns for nonappearance. Regarding danger, pretrial services was

concerned about the instant allegations coupled with the reoccurring violent behavior, active mental health symptoms, and active protection orders. Although defendant had minimal criminal history and had been accepted into residential treatment, pretrial services viewed him as a danger to the community.

At the hearing, the government moved for detention while defendant requested release. (R. 2 at 2, R. 4 at 2.) The magistrate judge released defendant on conditions, including travel restricted to Central District of California and the Eastern District of Wisconsin; avoid all contact with victims; location monitoring with an ankle monitor; digital device restriction; $50,000 appearance bond signed by his father; participate in mental health treatment at Meadowglade; and abide by other standard terms (no guns, search condition, no drugs, and participate in required testing). (R. 2 at 2, R. 4 at 2.)

On the government's request, the magistrate judge stayed the release order until February 21, 2025, to allow the government to seek review. (R. 2 at 2, R. 4 at 2-3.) On February 21, 2025, I stayed the release order pending review by this court and set an expedited briefing schedule. (R. 3.)

## II. BAIL STANDARDS

The district court conducts an independent review of a magistrate judge's bail decision. See United States v. Wilks, 15 F.4th 842, 847 (7th Cir. 2021); United States v. Bruma, No. 1:23-CR-58-HAB, 2024 U.S. Dist. LEXIS 220279, at *2 (N.D. Ind. Dec. 5, 2024); United States v. Langdon, No. 3:22-CR-30138-NJR, 2024 U.S. Dist. LEXIS 128182, at *6 (S.D. Ill. July 19, 2024). The court may "start from scratch" and hold a new hearing or evaluate the record of the proceedings before the magistrate judge. See United States v. Torres, 929 F.2d 291, 292 (7th Cir. 1991).

A defendant charged with an offense may be released on personal recognizance, released on conditions, temporarily detained, or detained. 18 U.S.C. § 3142(a). The court will order detention only if it finds that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C. § 3142(e)(1). In making a release determination, the court considers the nature and circumstances of the offense charged, the weight of the evidence against the defendant, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The government bears the burden of justifying detention and must prove danger by clear and convincing evidence, United States v. Portes, 786 F.2d 758, 764 (7th Cir. 1985), and flight risk by a preponderance of the evidence, id. at 765. "[A] finding of either danger to the community or risk of flight will be sufficient to detain the defendant pending trial." Id. (emphasis added).[3]

### III. DISCUSSION

**A.     Positions of the Parties**

    **1.     Government's Motion**

The government contends that defendant should be detained as a danger and a flight risk, although its primary concern is danger. Regarding the nature of the offense, the government stresses that defendant threatened to bomb a school and to torture and murder children and young adults, in part due to their religious beliefs and ethnicity. He also threatened

---

[3] At one point in his response, defendant suggests that the government must demonstrate danger and flight risk to support detention (R. 4 at 4), but that is incorrect; either will suffice.

7

to rape and murder other victims. (R. 2 at 3.) The government notes that USM took the threats seriously, canceling scheduled events and closing the school. (R. 2 at 4.) The government also notes defendant's threats to his own family, including threatening to kill his father (R. 2 at 4); his Instagram videos threatening Jewish students (R. 2 at 5); his threats directed at M.J., the former USM student currently attending college in Santa Barbara and living in the same apartment complex as defendant, which resulted in defendant's arrest for stalking by state authorities (R. 2 at 5); and defendant's threats, posted on his personal Instagram page, to kill a number of current and former USM students (R. 2 at 5-6). The government indicates that, in addition to the threats directed at former USM student H.L., discussed above, defendant posted a photo of children who currently attend USM, crossed their faces out, and posted the word "DEATH" on the image. (R. 2 at 5-6.)

The government further contends that the weight of the evidence is very strong. Defendant's bomb threat against USM was made in a fashion that might reasonably have been believed, his threats against many individuals were specific and extremely violent, and he made plain his motivation for those threats. The threats are captured on recorded voicemail messages, social media videos, cellphone records, and witness statements that directly link defendant to the threats. Defendant identified himself in social media videos and in voicemails when the threats were made. (R. 2 at 6.)

Regarding defendant's history and characteristics, while he does not have a prior criminal record, the government stresses his increasingly erratic and violent behavior over the past six months. (R. 2 at 6.) As detailed in the bond study, on August 28, 2024, defendant was admitted into Santa Barbara Cottage Hospital after making violent threats towards himself and his roommate; on October 1, 2024, while visiting Milwaukee, defendant's family requested

8

police intervention due to defendant making violent threats towards family members; on December 16, 2024, local police were called because defendant threw chairs in multiple businesses; on December 19, 2024, defendant allegedly made violent threats to a California Mosque and was reported missing by family members; on December 23, 2024, defendant allegedly assaulted an employee of a local grocery store and a security guard at a marijuana dispensary, and, following his arrest, spit on a police officer; and, on December 30, 2024, defendant was reported to be yelling and allegedly making violent threats from his apartment, with his roommate requesting a police escort to retrieve his belongings from the apartment. (R. 2 at 6-7.) The government further stresses defendant's history of mental health concerns, including several recent involuntarily hospitalizations, and his admission to experimenting with marijuana daily since moving to California. Defendant had been a lifetime resident of Milwaukee before moving to California for school in August 2024. (R. 2 at 7.)

Regarding the nature and seriousness of the danger that would be posed by release, the government argues that threats to bomb a school and kill people, including children, because of their race or religion clearly presents a danger to the identified victims and the larger community. The risk of these threats is heightened because of defendant's unstable mental condition and his violent rage towards specific individuals and USM. The government notes that USM is a school with children ranging from toddlers in pre-kindergarten to high schoolers; many of those children are Jewish and Indian, defendant's targeted groups. The government concludes that detention as a danger is appropriate based on the instant allegations coupled with defendant's reoccurring violent behavior, apparent mental health deterioration, and inability to control himself. (R. 2 at 7-8.)

Finally, the government argues that defendant also presents a risk of nonappearance.

In light of the nature of his offenses, the serious penalties he is facing, his recent move out of Wisconsin, and his mental instability, the court should find that he is a flight risk, and that no conditions of release would sufficiently lessen that risk. (R. 2 at 8.)

### 2. Defendant's Response

Defendant responds that, after careful consideration, the magistrate judge determined that defendant could be released with strict conditions so that he could obtain mental health intervention as arranged by his family and defense counsel. He asks this court to uphold that decision. (R. 4 at 3.)

Defendant stresses his ties to the community, demonstrating that he is a good candidate to return to all future court appearances. His family resides in Milwaukee, and he had been a lifetime resident of the area prior to moving to California for school in 2024. (R. 4 at 4.) Defendant further contends that his mental health issues can be addressed by inpatient mental health treatment at Meadowglade, and that further delay in treatment will only harm his already fragile mental state. (R. 4 at 4-5.) Defendant acknowledges his substantial history of mental health issues but stresses the absence of any actual violent or assaultive behavior. (R. 4 at 5.)

Regarding the seriousness of the offense and weight of the evidence, defendant responds that USM did not consider the alleged threats entirely credible. He cites an email from the Chief Operating Officer (COO) of USM to parents indicating that the threats were not believed to be credible, but that USM was still proceeding with appropriate levels of caution. (R. 4 at 5, R. 4-1.) Additionally, USM only responded with a partial close of the campus. Defendant contends that his alleged threats therefore do not necessarily lead to a conclusion that he presents a danger to the USM community or the community at large, especially when his conditions of release will require him to receive the mental health treatment that he so

10

desperately needs to address the underlying cause of the conduct before the court. Given these considerations, defendant contends the court should find that the government has not met its burden of establishing danger by clear and convincing evidence. (R. 4 at 5-6.)

Defendant further stresses that his rehabilitation and recovery related to his mental health treatment would be substantially impeded if this court were to reverse the release order and instead require detention. He indicates that, during his short time in federal custody in California, he has been unable to receive important medications that he was receiving while in the local jail and, as a result, is at risk of destabilizing. Moreover, as part of the diversion agreement he reached with California authorities, he will be required to attend Meadowglade, and his participation will be monitored by the courts in California. Defendant contends that he would not pose a risk to the community while at Meadowglade as he would be unable to leave the treatment facility on his own volition. Additionally, the magistrate judge ordered location monitoring with an ankle monitor, an added layer of protection for alleged victims both in California and in Wisconsin, and prohibited use of devices to send threatening messages. (R. 4 at 6.)

Defendant concludes that he has strong family ties to the Milwaukee area, has retained counsel and is taking this matter seriously, is actively engaged in mental health treatment, does not have a history of criminal behavior or failure to appear in court, and has a history of pro-social behavior and moved to California to further his education. Therefore, he contends, the government has not met its burden of establishing flight risk by a preponderance of the evidence. The magistrate judge's release order should not be disturbed as it contains sufficient conditions to ensure his appearance in court. The current release order also has sufficient conditions in place to ensure the safety of the community. (R. 4 at 7.)

11

### 3. Government's Reply

The government replies that defendant makes two primary arguments in favor of release: (1) he will voluntarily receive mental health treatment, and (2) USM did not find his threats entirely credible. The government argues that neither undermines the clear and convincing evidence of danger. (R. 5 at 1.)

The government first notes that, while defendant does need mental health treatment, and it is possible such treatment could ameliorate the danger he poses, he could simply walk out of Meadowglade, a voluntary facility. Similarly, he could remove a location monitoring bracelet. (R. 5 at 1-2.) The government likewise doubts defendant's consent to comply with the treatment arranged by his family, given his threatening behavior towards his family, threats his family took seriously enough to involve the police. (R. 5 at 2.)

Second, the government argues that the email from the USM COO actually supports detention. (R. 5 at 2.) The email stated: "With the assistance of authorities, we believe we have identified the source of these threats, and <u>that individual has been detained</u> by authorities in a different part of the country. <u>Given this information, we do not believe these threats to be credible</u>, but are still proceeding with appropriate levels of caution." (R. 4-1 at 1, emphasis added.) In other words, USM was able to assure the school community it was not in danger only because defendant had been detained in California. (R. 5 at 2.) The government further takes issue with defendant's claim that he lacks a history of any actual violent or assaultive behavior, noting the erratic and violent behavior discussed in the bond study. (R. 5 at 3.)

Finally, the government stresses that defendant should be detained as a danger and a flight risk. The statute requires the court to consider an individual's "mental condition" when assessing whether he poses a risk of nonappearance. 18 U.S.C. § 3142 (g)(3)(A). Here, the

12

government contends, the court can have no confidence defendant will comply with any release conditions or attend future hearings. "The severity of the defendant's mental health issues combined with his violent threats and violent assaults makes him a high-risk defendant. The appropriate approach is to continue detention until there is a clear assessment of his mental health needs and a thoughtful plan for release that does not put his victims or the community in danger." (R. 5 at 4.)

**B.    Analysis**

On review of the § 3142(g) factors, I find that the government has demonstrated danger by clear and convincing evidence and flight risk by a preponderance of the evidence. The offense involves specific threats, made in a context in which those threats must be taken seriously. In some situations, a school bomb threat phoned in from 2000 miles away, while disconcerting, might be brushed aside. But here defendant also allegedly threatened individual students and former students, including one residing in the same city (and apartment complex) as him. The evidence appears to be strong, with many of the threats captured on voicemails and videos, and with defendant identifying himself in some of them.

While defendant's clean criminal record, family support, and community ties weigh in favor of release, his significant mental health issues and behavior over the past six months weigh in favor of detention. Defendant offers no response to the government's detailed presentation regarding his erratic and, at times, violent behavior since August 2024.

Finally, this is a case in which release would pose a danger to a specific institution and specific individuals. And, given the serious penalties defendant is facing, his move out of Wisconsin, and his mental instability, defendant poses a serious risk of non-appearance.

If the court finds release would endanger the community or create a serious risk of flight,

it must also consider whether any condition or combination of conditions would reasonably mitigate those risks. See United States v. Lewis, No. 23-2137, 2023 U.S. App. LEXIS 16935, at *4 (7th Cir. July 5, 2023). Defendant primarily relies on his planned stay in a residential treatment facility, but he offers little or no detail on that program, and the record suggests he could walk away from this facility at any time. His family also appears to have little or no ability to control or guide his actions. In any event, his family resides in Wisconsin, so those ties would provide little assurance of compliance if defendant were to be released in California.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the government's motion (R. 2) is granted, and defendant's release is stayed pending a de novo hearing in this court.

Dated at Milwaukee, Wisconsin, this 27th day of February, 2025.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge